Filed 10/2/23  Jackson v. Regents of the University of California CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| VICTORIA JACKSON, | |
| Plaintiff and Appellant, | G060491 |
| v. | (Super. Ct. No. 30-2018-00973539) |
| THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, | O P I N I O N |
| Defendant and Respondent. | |

Appeal from a judgment of the Superior Court of Orange County, Theodore R. Howard, Judge.  Affirmed.

Employee Justice Legal Group, Kaveh S. Elihu and Samuel J. Moorhead, for Plaintiff and Appellant.

Horvitz & Levy, Eric S. Boorstin and Lacey L. Estudillo, and Sanders Roberts, Reginald Roberts, Felton T. Newell and Eric S. Mintz for Defendant and Respondent.

                    *          *          *

Victoria Jackson appeals from a judgment in favor of respondent The Regents of the University of California. She contends the trial court erred in granting respondent's motion for nonsuit or directed verdict on all her claims of disability discrimination. As discussed below, we find no error and accordingly, affirm.

                                        I

                    FACTUAL AND PROCEDURAL BACKGROUND

A. *DFEH Complaint*

On February 15, 2017, appellant filed a complaint of employment discrimination with the Department of Fair Employment and Housing (DFEH). She alleged that respondent took adverse actions against her, including discrimination, retaliation, denial of medical leave, denial of reasonable accommodation, termination, and failure to rehire due to appellant's disability, engagement in protected activity, medical leave and medical condition. The DFEH administrative charge alleged: "Sometime in early February of 2016, [appellant] began to experience health issues, which she immediately reported to her supervisors, including but not limited to Cathleen Matuba [*sic*], Estella Garcia [*sic*], Michelle Duran, Ashley Doe, and Stella Joyce [*sic*] that she required medical attention. As a result of her medical condition, Jackson was given medical leave between February 11, 2016 through February 20, 2016. On February 16, 2016 [respondent] terminated [appellant's] employment in discrimination of her disabilities/perceived disabilities, medical condition, and in retaliation for her engagement in protected activities with respect to those protected classes."

B. *FEHA Complaint*

On February 14, 2018, appellant filed a complaint for damages, alleging causes of action for discrimination, retaliation, failure to prevent discrimination and retaliation, failure to provide reasonable accommodations, failure to engage in a good faith interactive process in violation of the Fair Employment and Housing Act (FEHA),

                                        2

and for declaratory judgment. The FEHA complaint alleged that appellant was hired by respondent as an administrative staff member on July 13, 2015. On February 11, 2016, appellant began experiencing severe heart palpitations while at work. She informed her supervisor and visited a medical provider later that day. Her medical provider placed her on medical leave and instructed her to undergo further diagnostics. Appellant informed respondent of her medical provider's advice. On February 12, 2016, appellant visited another medical provider who placed her on medical leave until February 19, 2016. On February 15, 2016, appellant informed her supervisor that she was placed on medical leave by her medical provider. The next day, while on medical leave, appellant was informed she was terminated.

C. *Motion for Summary Judgment*

Respondent moved for summary judgment on the entire complaint. In the motion, respondent contended appellant could not establish causation, a required element of her FEHA claims, because she was terminated on February 10, 2016, the day before she informed respondent about experiencing chest pain.

Respondent further asserted that even if appellant could show causation, the undisputed facts established that it had legitimate, nondiscriminatory and nonretaliatory reasons to terminate appellant. Specifically, she was not meeting expectations and was tardy 11 times.

The trial court (Judge Walter Schwarm) denied the summary judgment motion. It found "a triable issue of material fact as to whether [respondent] made the decision to terminate [appellant] on 2-10-16." It noted that in her deposition, department manager Susana Miranda testified she did not know whether a decision had been made to terminate appellant on February 10. Additionally, appellant testified at her deposition that her officer manager, Stella Garcia-Estrella, expected appellant to be at work on February 11, and on February 15, Garcia texted appellant, requesting that she show up at 7:20 a.m. for work.

3

D. *Trial Evidence*

1. *Stipulated Facts*

The parties stipulated that in July 2015, respondent hired appellant in a temporary position. On December 14, 2015, appellant started a permanent position as an admitting worker for the Gavin Herbert Eye Institute (Eye Institute) of U.C. Irvine Health. The first six months of her employment was a probationary period. On Thursday, February 11, 2016, appellant left work due to chest pains. That same day, she was seen by Dr. Joanne Pagal, an urgent care doctor, who placed her off work for that day. The next day, February 12, 2016, Jackson visited her primary care doctor. At that visit, she received a note to be off work from February 12, 2016 through February 19, 2016. On February 16, 2016, appellant was informed, on the phone, that her employment was terminated.

2. *Appellant's Case-in-chief*

a. *Appellant's testimony*

Appellant testified she started as a floater with U.C. Irvine in July of 2015, working as an admitting worker at any U.C. Irvine campus that needed assistance. In November of 2015, she began working with Kathleen Maatubang in the front office of the Eye Institute. At the time, Michelle Duran was the manager of the Eye Institute, and Susana Miranda was the practice manager, located at the Orange office.

In late December 2015, appellant told Duran she was suffering from "migraine headaches and anxiety." She told Duran the migraines caused her to feel dizzy and nauseous, resulting in her having to take breaks and use the restroom more often. Her anxiety caused her to feel like "somebody was sitting on [her] chest" and to lose control. Appellant also told Duran that sometimes when she had headaches, she became sensitive to light. Duran provided appellant with a polarized screen protector for her computer, but it did not remedy her migraines. Appellant told Maatubang the screen protector did not help her, but she did not inform anyone else. However, appellant did

4

tell Duran she was continuing to experience migraines. She did not ask for any additional accommodation, but told Duran she might have to "step away" from work to go to "the bathroom, drink water, just take a breather, [or] pop some aspirins." Duran responded, "Okay. I understand."

Appellant testified that on January 22, 2016, she attended a meeting with "Duran and others" and was introduced to her new supervisor, Stella Garcia-Estrella. During that meeting, appellant "mentioned [her] migraine headaches and anxiety" so Garcia-Estrella would be aware of her ongoing issues.

Appellant testified that she came to work on February 11, 2016, even though she suffered a severe migraine headache the previous night that kept her up all night. Jackson left work early because she was experiencing chest pain. Before leaving, she informed her supervisor.

After she left work, she drove to the emergency room and saw Dr. Pagal. She told Dr. Pagal that she was having "excruciating pain in my chest" and "felt like [she] was going to have a heart attack." Dr. Pagal diagnosed appellant with heart "palpitations" and "hypokalemia" or low potassium. Dr. Pagal provided appellant with a doctor's note placing her off work on February 11, 2016, and advised appellant to see her primary care physician immediately.

Appellant informed her supervisors of Dr. Pagal's note and recommendation. She spoke with Garcia-Estrella and texted Duran. Appellant also called Duran to inform her that she would not be coming into work the next day. Instead, she visited her primary care physician that day. Appellant told the doctor that she suffered from migraine headaches and anxiety. The doctor provided Jackson a note placing her off work from February 12, 2016 through February 19, 2016, and prescribed Jackson ibuprofen. The note did not provide a diagnosis, but stated that appellant could return to work "at full capacity" on February 20, 2016.

5

Appellant then notified Duran and Garcia-Estrella that she would be out through the end of the week "due to [her] doctor's orders." Duran advised her to submit a doctor's note "as soon as Monday," but she could not do so because Monday was a holiday. Garcia-Estrella contacted appellant that Monday and requested that she come into work the next day, February 16.

Early on February 16, 2016, Jackson called the "attendance line" and left a message detailing that she would be out of work due to a doctor's note. Appellant later called Human Resources and spoke with Shear about how to submit the doctor's note. During that call, appellant informed Shear about her migraine headaches and anxiety. Shear called back to inform appellant that it was not necessary to submit the note because she had been released during her probationary period for failure to meet expectations. Subsequently, she received a termination letter signed by Miranda, and dated February 16, 2016.

On cross-examination, appellant acknowledged that during her February 16, 2016 phone call with Shear, Shear informed her that "they had tried to notify you of your termination prior to February 16, 2016," but could not because she "was off sick." Appellant also admitted that at the January 22, 2016 meeting when she was introduced to Garcia-Estrella, Duran told her that she "mov[ed] too slowly in [her] work," "was not picking up [her] weight as compared to other workers in the front[,]" and talked about her issues with "checking in patients or clients." There was also a prior meeting with Duran and Maatubang where appellant was counseled on her performance issues. On redirect examination, appellant stated Maatubang counseled her about her performance issue after she advised Maatubang about her migraine headaches and anxiety.

Appellant called Maatubang, Duran, Garcia-Estrella, Shear and Miranda as adverse witnesses.

6

b. *Kathleen Maatubang*

Maatubang testified she was the principal admitting officer and front office lead at the Eye Institute when appellant was initially hired in 2015. When appellant first started working at the Eye Institute, Maatubang thought she was "great," "really nice," and had a "very cordial relationship with patients." Maatubang recommended appellant be hired for a full-time staff position. After appellant started working in the permanent position, however, Maatubang observed a decline in her work performance and enthusiasm for the job. Appellant often would start work late, and return from lunch and breaks late. She also would take her breaks when the clinic was "really busy." Appellant also would be on her phone instead of doing her work, more than other front desk workers. Sometimes, appellant would make mistakes with patients' insurance record, "creating the risk that even a patient with insurance might receive a medical bill." Maatubang spoke with appellant about her punctuality, and counseled her on various performance issues, but she was not receptive.

Maatubang reported appellant's performance and attendance issues to her supervisors, who asked Maatubang to prepare a written document identifying her concerns. In the document, Maatubang stated she did not believe appellant was reliable enough to take on more responsibility, and opined that appellant worked faster before she got hired.

Maatubang testified she had no knowledge of appellant's headaches, migraines or anxiety. Appellant never provided her with any medical note or requested an accommodation for any medical issue.

c. *Michelle Duran*

Duran testified she was the most senior person at the Eye Institute, although Susana Miranda and Ashley Shear, who are located 15 miles away, were superior to her in the organizational hierarchy. Duran did not have personal knowledge of appellant's daily work performance; she relied on Maatubang and Garcia-Estrella for that

7

information. On February 10, 2016, Duran emailed Ashley Shear of Human Resources, asking Shear to "generate an attendance letter" for Jackson indicating Jackson was tardy nine times between January 6 and February 5, 2016, and had an unscheduled call out on January 28, 2016. The tardiness/absence dates in Duran's email were based on Jackson's "time clock report" and not what Maatubang or Garcia-Estrella had told her. In the email, Duran indicated that Jackson's nine tardies equaled three "occurrences" under UCI's Rules for Attendance and that her unscheduled call out equaled one "occurrence" under the work rules. At the fourth occurrence, a letter of warning would be sent to the employee under the work rules.

Duran testified there is an "investigative process that H.R. [Human Resources] does with the Department" before there is a decision to terminate an employee. Thereafter paperwork is prepared and the employee is notified of the termination. When Duran requested the attendance letter from Shear, she had no intention of moving forward with terminating appellant's employment. She learned from Shear that the decision to terminate appellant was made on February 10, 2016, but understood from later e-mails that the termination was postponed until February 16, 2016 because appellant was absent from work or the office was closed.

Duran did not recall appellant telling her about having migraines or headaches or suffering anxiety. She also did not recall appellant requesting accommodation due to a disability.

d. *Stella Garcia-Estrella*

Garcia-Estrella testified she was appellant's supervisor beginning in December 2015. During this period, she was informed that appellant twice had left money unattended at the front desk at the end of the workday, and had arrived late for her shifts several times. Garcia-Estrella also observed that appellant was tardy and less productive than her coworkers with registering patients. She informed her supervisor,

8

Michelle Duran, of appellant's work performance issues at least twice. She did not know that appellant would be terminated and she was not involved in the termination decision.

Appellant never told Garcia-Estrella she had a migraine or headaches. Nor did Garcia-Estrella hear from anyone that appellant was suffering from migraines or headaches. Appellant never asked her for a medical accommodation.

e. *Ashley Shear*

Shear did not prepare the attendance letter that Duran requested because after Duran requested the letter, Miranda made the decision to terminate appellant's employment with Shear's approval. Shear prepared an initial "probationary release" letter dated February 12, but erroneously included Duran's signature on the letter "in error" because Duran did not have authority to terminate appellant's employment. The letter stated that Jackson was "being released from employment with the University of California, Irvine Medical Center effective immediately" for failure to "meet expectations." Shear later prepared a revised probationary release letter dated February 16, 2016, for Miranda's review and signature.

Shear testified that she recommended appellant be released because "it's a red flag" if an employee has "performance issues or attendance issues early on in their employment or early on in their probationary period." She did not base her decision on a medical disability because she had no knowledge that appellant claimed any form of disability or perceived appellant as suffering from a disability. Prior to February 16, 2016, Shear was not aware that appellant ever provided a medical note or requested an accommodation. Shear also testified that there was no discussion, either verbal or written, about medical disability when the decision to terminate appellant was made.

f. *Susana Miranda*

Miranda testified the decision to terminate appellant occurred on February 10, 2021. Miranda had no reason to believe that appellant suffered from any form of disability prior to February 10, 2016. She was not aware of appellant ever complaining

9

of a medical disability or providing a medical note prior to February 10, 2016. Miranda also testified that she and Shear had agreed to inform appellant about her release on February 12, but postponed it to February 16, 2016 because appellant "did not come in" to work. After questioned by payroll about whether and how much appellant should be paid for February 16, Miranda instructed "8 regular hours."

g. *Mark Olaf Falkenhagen*

Finally, appellant called Falkenhagen, a forensic economist, who testified appellant suffered an economic loss totaling $814,957 due to the termination.

3. *Defense Case*

Respondent called an expert to present an economic damages analysis, and then rested. After respondent rested, there was no rebuttal by appellant.

E. *Motion for Nonsuit*

After plaintiff rested, respondent moved for nonsuit via a written motion. The court deferred ruling on the motion to allow appellant to file a written opposition. After both parties rested their respective cases, the trial court considered respondent's written nonsuit motion and appellant's written opposition.

In the nonsuit motion, respondent argued all of appellant's claims are time-barred under FEHA's one-year statute of limitations. After noting that appellant filed the DFEH complaint on February 15, 2017, respondent asserted that all allegedly discriminatory conduct occurring before February 15, 2016 is time-barred. This included appellant's probationary release because the undisputed evidence established respondent made the decision to release appellant on February 10, 2016. Although appellant was notified about the termination on February 16, 2016, respondent argued the notification is not an adverse employment action under the FEHA. In the alternative, respondent argued that even if the termination decision fell within the statutory period, appellant failed to establish a prima facie case of disability discrimination based on the scope of her DFEH complaint. Specifically, because the DFEH complaint was based on a medical condition

10

appellant suffered in early February 2016, appellant is limited to chest pain or heart palpitation. Respondent argued there was no evidence that the decision makers, Shear and Miranda, had any notice or knowledge that appellant was suffering from chest pain or palpitations when they decided to terminate appellant's employment.

In her written opposition, appellant argued FEHA's one-year limitations period runs from the date of actual termination, which was February 16, 2016, and not the date respondent decided to terminate her employment.

After additional argument by the parties, the trial court granted respondent's nonsuit motion, concluding that appellant failed to present sufficient evidence of her causes of action. In explaining its reasoning, the court addressed respondent's affirmative defense of the statute of limitations, concluding appellant "has a problem with the statute of limitations." During its discussion of the issue, the court addressed the "scope of [appellant's] [DFEH] complaint," noting that appellant was "restricted to the allegations fairly reflected in the administrative charge." The court determined that in the DFEH complaint, appellant did not "describe any events prior to early February of 2016." It found "no allegation of a causal connection between [appellant's] termination and any conduct or event other than the medical condition of February 11th, 2016," which was "chest pain." Aside from issues with the timeliness and scope of the DFEH complaint, the court also found other problems with appellant's prima facie case. It determined that appellant failed to show a qualified disability because she presented no expert evidence of an "ongoing condition or disability before on or February 10, 2016 that would cause a limitation of a major life activity sufficient to constitute physical disability under F.E.H.A." As to medical conditions after February 10, appellant "failed to provide any evidence for the jury to consider that her ailment was anything more than a mild, temporary condition with little or no residual effects" because she "did not provide any evidence that the chest pains or palpitations were ever experienced again."

11

The court summarized its findings in granting the nonsuit motion. First, appellant was a probationary employee in February 2016 who could be terminated without cause for any reason that was not illegal. Second, the decision to terminate appellant was made on February 10, 2016, and only communicated to appellant on February 16, 2016 by Shear in a telephone conversation. Third, appellant failed to prove a qualifying disability. Fourth, she failed to prove she could carry out the essential functions of her job with a reasonable accommodation. Fifth, she failed to prove that the decision makers were aware she was disabled or perceived her to be disabled. Sixth, her DFEH complaint based its claims of discrimination only on actions that occurred after the decision to terminate her had been made. Seventh, the only adverse employment action was the decision to release appellant.

After the court granted respondent's nonsuit motion, appellant's counsel asked if it would be futile to reopen the case in light of the ruling on the statute of limitations. The court responded that because its decision on the nonsuit motion was based on two reasons, only one of which related to the statute of limitations, "I would rather give you the opportunity to present additional evidence on the causes of action that have been presented." Appellant's counsel requested a brief break and after returning from the break engaged in a lengthy soliloquy before declining to take any action to reopen the case.[1]

---

[1] We note that although in the Statement of the Case in her opening appellate brief, appellant states that her contentions on appeal include that the court "impermissibly denied leave to Appellant to reopen her case after granting the [Nonsuit] Motion," she does not follow up with further argument on this issue. Accordingly, the issue is forfeited. (See *Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].) Even if not forfeited, the record does not support her claim that she was denied leave to reopen. Rather, she never affirmatively requested the case be reopened.

12

Judgment based on "directed verdict" was entered on July 8, 2021. Appellant timely appealed.

## II

### DISCUSSION

"[I]f a defendant believes that the plaintiff has not presented substantial evidence to establish a cause of action, the defendant may move for a nonsuit if the case has not yet been submitted to the jury, a directed verdict if the case is about to be submitted, or a judgment notwithstanding the verdict (jnov) following an unfavorable jury verdict." (*Fountain Valley Chateau Blanc Homeowner's Assn. v. Department of Veterans Affairs* (1998) 67 Cal.App.4th 743, 750. Here, because the parties both rested before the trial court ruled, the court's ruling on respondent's nonsuit motion is more properly characterized as a ruling granting a motion for directed verdict. Nonetheless, for the sake of clarity we will adopt the trial court's and appellant's terminology because "[w]hile made at different times, [nonsuit and directed verdict] motions are analytically the same and governed by the same rules." (*Ibid.*)

"Like a motion for nonsuit, a motion for a directed verdict is in the nature of a demurrer to the evidence. [Citations.] In determining such a motion, the trial court has no power to weigh the evidence, and may not consider the credibility of witnesses. It may not grant a directed verdict where there is *any* substantial conflict in the evidence. [Citation.] A directed verdict may be granted only when, disregarding conflicting evidence, giving the evidence of the party against whom the motion is directed all the value to which it is legally entitled, and indulging every legitimate inference from such evidence in favor of that party, the court nonetheless determines there is no evidence of sufficient substantiality to support the claim or defense of the party opposing the motion, or a verdict in favor of that party." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 629–630.) "A mere 'scintilla of evidence' does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict.'

13

[Citation.]" (*Nally v. Grace Community Church* (1988) 47 Cal.3d 278, 291 (*Nally*).) Similarly, "[m]ere conjecture or nonsensical interpretations of evidence are not sufficient to overturn a nonsuit" or directed verdict. (*Kidron v. Movie Acquisition Corp.* (1995) 40 Cal.App.4th 1571, 1580.)

We review an order granting a nonsuit or directed verdict de novo. (*Thrifty Payless, Inc. v. Mariners Mile Gateway, LLC* (2010) 185 Cal.App.4th 1050, 1060 [appellate review of nonsuit]; *Los Angeles Unified School District v. Torres Construction Corp.* (2020) 57 Cal.App.5th 480, 509 [appellate review of directed verdict].) Thus, even if the trial court misapplied the legal standard for granting a nonsuit, as appellant argues, we may still affirm the ruling if respondent was entitled to nonsuit under the correct standard. We turn to appellant's challenges to the rulings.

A. *The Law of the Case Doctrine Does Not Apply*

We first examine a collateral attack on the court's ruling. Appellant contends that the court (Judge Howard) could not grant nonsuit under the law of the case doctrine because Judge Schwarm previously denied respondent's summary judgment motion, which was made on similar grounds. We disagree that the law of the case doctrine applies. "Under this doctrine, 'the decision of an appellate court, stating a rule of law necessary to the decision of the case, conclusively establishes that rule and makes it determinative of the rights of the same parties in any subsequent retrial or appeal in the same case.' [Citation.]" (*Nally*, *supra*, 47 Cal.3d at pp. 301–302.) Here, there has been no prior appellate court decision in this case, and thus the law of the case doctrine does not apply.

Nonetheless, we acknowledge that appellant's argument relies on a related legal principle: "Generally, one trial court judge may not reconsider and overrule an interim ruling of another trial judge." (*In re Marriage of Oliverez* (2015) 238 Cal.App.4th 1242, 1248, citing *Curtin v. Koskey* (1991) 231 Cal.App.3d 873, 876–878.) "For one superior court judge, no matter how well intended, even if correct as

14

a matter of law, to nullify a duly made, erroneous ruling of another superior court judge places the second judge in the role of a one-judge appellate court." (*In re Alberto* (2002) 102 Cal.App.4th 421, 427.) However there is an exception "when the facts have changed or when the judge has considered further evidence and law." (*In re Marriage of Oliverez*, *supra*, 238 Cal.App.4th at p. 1248.) Here, Judge Howard did not nullify Judge Schwarm's ruling on the summary judgment motion because he did not reconsider Judge Schwarm's ruling and determined summary judgment should have been granted. Rather, he found appellant failed to produce sufficient evidence at trial to establish a prima facie case and granted nonsuit. Additionally, the summary judgment motion was based on filed declarations and deposition transcripts, whereas the nonsuit motion was based on evidence elicited at trial and subject to cross-examination. In sum, Judge Schwarm's ruling did not bar Judge Howard from granting nonsuit.[2]

Having determined that the court could grant a nonsuit, we next examine appellant's substantive challenges to the court's rulings. As discussed above, the court granted nonsuit based on two general grounds. First, the claims were barred due to appellant's failure to exhaust her administrative remedies based on the timeliness and scope of the DFEH complaint. Second, appellant failed to make her prima facie case, such as proving she had a disqualifying disability or that the decision makers were aware or perceived that she was disabled. We address each ground in turn.

B. *Timeliness and Scope of the DFEH Complaint*

"An employee who wishes to file suit under the FEHA 'must exhaust the administrative remedy provided by the statute by filing a complaint with the' DFEH, 'and must obtain from the [DFEH] a notice of right to sue.' [Citation.] 'The timely filing of an

_____

[2] Appellant's reliance on *Conway v. Bughouse, Inc.* (1980) 105 Cal.App.3d 194, is misplaced because that case involved the grant of partial summary judgment whereas this case involved the denial of summary judgment. Unlike the denial of summary judgment, the grant of partial summary judgment necessarily limited the issues that would be tried.

15

administrative complaint' before the DFEH 'is a prerequisite to the bringing of a civil action for damages.'" (*Pollock v. Tri-Modal Distribution Services, Inc*. (2021) 11 Cal.5th 918, 931 (*Pollock*).) "The administrative exhaustion requirement is satisfied if FEHA claims in a judicial complaint are '"like and reasonably related to"' those in the DFEH complaint [citation] or 'likely to be uncovered in the course of a DFEH investigation' [citation]." (*Clark v. Superior Court* (2021) 62 Cal.App.5th 289, 301.)

As to timeliness, we note appellant does not challenge the court's legal findings that (1) the applicable limitations period is one year from the date of her DFEH complaint, which was filed February 15, 2017, and (2) the sole adverse employment action which forms the basis of her claims relates to her termination or probationary release in February 2016.[3] The trial evidence establishes the decision to terminate appellant's employment occurred on February 10, 2016, but she was not notified about the termination until February 16, 2016. We also conclude after viewing the evidence in the light most favorable to appellant that she was actually terminated on February 16, 2016, based on the e-mail correspondence admitted at trial. Because the actual termination falls within the one-year limitations period, the statute of limitation does not bar the FEHA claims based on the termination. (See *Romano v. Rockwell Internat., Inc*. (1996) 14 Cal.4th 479, 493 ["If the administrative complaint must be filed within one year 'after' the unlawful practice—here, a discharge—'occurred,' then for the purpose of

---

[3] The Legislature has extended the limitations period to three years, effective January 1, 2020. (See Gov. Code, § 12960(e)(3); Stats.2019, c. 709 (A.B.9), § 1, eff. Jan. 1, 2020.)

16

that complaint, the administrative cause of action must accrue and the statute of limitations must run from the time of actual termination."].)[4]

The court also concluded that in examining what disability allegedly triggered the termination, appellant was limited to any medical condition that arose on or after February 11, 2016, based on the allegations in her DFEH complaint. These conditions would not include pre-February 2016 migraines, headaches and anxiety. Although appellant argues she satisfied her prima facie case on her various causes of action because she informed Maatubang, Duran, and Garcia-Estrella of her migraines, headaches and anxiety in December 2015 and January 2016, she does not address the trial court's ruling on the scope of the DFEH complaint in her opening brief. Accordingly, she forfeited any challenge to that ruling. (See *Benach v. County of Los Angeles*, *supra*, 149 Cal.App.4th at p. 852 ["When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived"].)

Even if not waived, we are not persuaded by appellant's argument that the pre-February 2016 medical conditions and complaints fall within the scope of DFEH complaint because they would have been discovered by a reasonable DFEH investigation. As the federal appellate court in *Lattimore v. Polaroid Corp.* (1st Cir. 1996) 99 F.3d 456 (*Lattimore*), has explained: "An investigation is a systematic inquiry into a particular matter. When it is launched in response to a charge of employment discrimination, the

---

[4] We acknowledge the trial court determined the decision to terminate, as opposed to the actual termination, was the sole adverse employment action at issue. We decline to address whether this determination is correct because even under the court's finding, appellant timely exhausted her administrative claim because it is undisputed that appellant did not become aware of the decision until February 16, 2016, when Shear informed her during a telephone call that she was being released. (Cf. *Pollock*, *supra*, 11 Cal.5th at p. 941 ["FEHA harassment claim based on a failure to promote accrues, and the limitations period under section 12960 begins to run, when the aggrieved employee knows or reasonably should know of the employer's decision not to promote him or her."].)

direction and scope of the investigation are guided by the allegations contained in the charge. Although an investigation is not strictly confined to allegations in the charge, it is not a 'fishing expedition' that should be expected to extend to matters unrelated to the charge." (*Id*. at p. 464.) Here, the DFEH complaint alleged that after appellant complained of health issues in early February 2016 and was granted medical leave, she was terminated on February 16, 2016. Thus, the scope of any DFEH investigation is limited temporally to February 2016. Any pre-February 2016 medical condition or complaints cannot be considered when analyzing whether appellant made a prima facie case on her FEHA claims. (Cf. *id.* at p. 465 [concluding harassment claims are outside scope of administrative complaint where plaintiff's "charge focused exclusively on his termination and the events leading up to it, all of which occurred after his injury. It contains no hint of any claim that, before his injury, Lattimore was harassed by Mitchell or anyone else. It makes no mention of Mitchell or any incidents of harassment. [¶] The two claims are based upon different facts that are separate and distinct both qualitatively and temporally."])[5]

Although the trial court found that the only medical conditions at issue were chest pain and heart palpitations, diagnosed on February 11, 2016, we conclude appellant also can assert claims based on hypokalemia or low potassium. Hypokalemia is "like and reasonably related" to palpitations and "likely to be uncovered in the course of a DFEH investigation" because Dr. Pagal diagnosed appellant with both palpitations and hypokalemia at the same urgent care visit on February 11, 2016. (*Clark v. Superior Court*, *supra*, 62 Cal.App.5th at p. 301.)

---

[5] "Because the antidiscriminatory objectives and the overriding public policy purposes of the FEHA and title VII of the Federal Civil Rights Act of 1964 (42 U.S.C. § 2000e et seq.) are identical, we may refer to federal cases where appropriate, even though the two acts differ in some particulars." (*Baker v. Children's Hospital Medical Center* (1989) 209 Cal.App.3d 1057, 1063.)

For the first time on appeal, in her reply brief, appellant contends that hypokalemia can cause migraines, and thus the pre-February 2016 migraines should be considered when evaluating her prima facie case on her causes of action. "A party may not raise an issue for the first time on appeal [citation], and points raised for the first time in a reply brief on appeal will not be considered, absent good cause for failure to present them earlier." (*Nordstrom Com. Cases* (2010) 186 Cal.App.4th 576, 583.) Additionally, appellant fails to persuade us that this new fact can be established without admissible expert testimony, which she has not produced. We thus conclude pre-February 2016 migraines cannot be considered when determining whether nonsuit should be granted.

C. *Prima Facie Case on Causes of Action*

Having concluded that appellant has a timely claim for disability discrimination based on medical conditions that occurred in February 2016, we examine whether appellant has or can make a prima facie case for disability discrimination. "On a disability discrimination claim, the prima facie case requires the plaintiff to show 'he or she (1) suffered from a disability, or was regarded as suffering from a disability; (2) could perform the essential duties of the job with or without reasonable accommodations, and (3) was subjected to an adverse employment action because of the disability or perceived disability.' [Citations]." (*Wills v. Superior Court* (2011) 195 Cal.App.4th 143, 159–160) "An adverse employment decision cannot be made 'because of' a disability, when the disability is not known to the employer." (*Brundage v. Hahn* (1997) 57 Cal.App.4th 228, 236.) "'While knowledge of the disability can be inferred from the circumstances, knowledge will only be imputed to the employer when the fact of disability is the only reasonable interpretation of the known facts. "Vague or conclusory statements revealing an unspecified incapacity are not sufficient to put an employer on notice of its obligations under the [FEHA]." [Citations.]'" (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1248 (*Avila*); cf. *Larson v. Koch Refining Co.* (D.Minn.1996) 920 F.Supp. 1000, 1005 [tardiness and poor work performance insufficient to impute

19

knowledge of a disability]; *Carlson v. InaCom Corp.* (D.Neb.1995) 885 F.Supp. 1314, 1322 [absenteeism and claims of occasional headache insufficient to impute knowledge of migraine condition].)  Likewise, "[e]vidence that a decision maker learned of a plaintiff's disability *after* deciding to take adverse employment action is not probative of whether the decision maker was aware of the plaintiff's disability when he or she made the decision.  Such evidence is irrelevant to determining whether the decision maker acted from a discriminatory animus." (*Avila*, *supra,* 165 Cal.App.4th at p. 1251.)

Here, the uncontradicted evidence establishes Miranda and Shear decided to terminate appellant's employment on February 10, 2016.  There is no evidence they reconsidered or revisited their decision.  There is no direct evidence the decision was motivated by a discriminatory animus.  Shear testified that disability was never discussed and both decision makers denied being aware that appellant had a disability or that they perceived she had a disability when they made the decision.  Viewed in the light most favorable to appellant, the evidence showed that Miranda and Shear became aware that appellant was suffering from a medical condition after February 10.  Appellant did not complain of chest pains until February 11, and Dr. Pagal did not diagnose appellant with palpitations and hypokalemia until later that day.  During February 2016, appellant did not inform Duran and Garcia-Estrella about any medical condition, including migraines or anxiety, until after the urgent care visit on February 11, 2016.  She did not inform her primary care physician about any medical condition, including migraines or anxiety, until February 12.  Thus, appellant cannot show the termination was "because of" her disability because Miranda and Shear were not aware of any disability when they made their decision on February 10.  Appellant thus failed to prove a prima facie case of disability discrimination.

20

For similar reasons, appellant failed to make her prima facie case for retaliation because appellant did not take medical leave or request accommodation for her chest pains and hypokalemia until February 11, which is after Miranda and Shear decided to terminate her employment. Thus, they could not have retaliated against appellant for taking medical leave or requesting an accommodation. (See *Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 74 ["[E]ach of the individuals who decided not to hire appellant for a particular position disclaimed knowledge of the fact that appellant had previously filed a grievance against the University. Without such knowledge, these individuals could not have acted in retaliation for appellant's filing of the grievance."].)

Because she could not prove her discrimination or retaliation claims, the derivative claim for failure to prevent discrimination and retaliation also fails. (See *Trujillo v. North County Transit Dist.* (1998) 63 Cal.App.4th 280, 289 ["'[T]here's no logic that says an employee who has not been discriminated against can sue an employer for not preventing discrimination that didn't happen, for not having a policy to prevent discrimination when no discrimination occurred . . . .'"]; cf. *Dickson v. Burke Williams, Inc.* (2015) 234 Cal.App.4th 1307, 1318 ["There cannot be a claim for failure to take reasonable steps necessary to prevent sex discrimination . . . if actionable sex discrimination has not been found."].)

Appellant's claims for failure to provide reasonable accommodation and for failure to engage in a good faith interactive process fail because the evidence showed respondent provided the accommodation appellant requested on February 11 and 12, which was medical leave pursuant to her doctor's notes. (See *Wilson v. County of Orange* (2009) 169 Cal.App.4th 1185, 1193 & 1195 [noting employer cannot be held liable for failing to provide a reasonable accommodation or to engage in interactive process when the employee was in fact provided a reasonable accommodation and engaged in a good faith interactive process to arrive at that accommodation].)

21

Respondent is not obligated to provide accommodations once it no longer employs appellant. (Cf. *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 226–227 (*Hanson*) ["'Reasonable accommodation does not require the employer to wait indefinitely for an employee's medical condition to be corrected.' [Citation.]"].)

Finally, although not separately denominated in her FEHA complaint, appellant contends she alleged a cause of action for wrongful termination in violation of public policy based on her probationary release due to alleged disability discrimination. To the extent she adequately pled that claim, it also fails for the same reasons; she fails to prove a prima facie case of disability discrimination stated above. (See *Featherstone v. Southern California Permanente Medical Group* (2017) 10 Cal.App.5th 1150, 1169 ["Under California law, if an employer did not violate FEHA, the employee's claim for wrongful termination in violation of public policy necessarily fails."]; *Hanson*, *supra*, 74 Cal.App.4th at p. 229 ["[B]ecause Hanson's FEHA claim fails, his claim for wrongful termination in violation of public policy fails."].)

## III

### DISPOSITION

The judgment is affirmed. Respondent is entitled to its costs on appeal.

DELANEY, J.

WE CONCUR:

O'LEARY, P. J.

MOTOIKE, J.

22